O

# United States District Court
# Central District of California

| | |
|---|---|
| CHLOE BIRD, | Case № 2:20-cv-08902-ODW (AGRx) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| Defendant. | |

This is an action under the Employee Retirement Income Security Act ("ERISA") to recover supplemental life insurance benefits. On August 2, 2021, the parties lodged the Administrative Record and Plan Documents with the Court. (Not. Lodging, ECF No. 31.) On September 17, 2021, the Court held a bench trial and took the matter under submission. (Mins. One Day Ct. Trial, ECF No. 46.) Based on the Administrative Record, the briefs submitted by the parties, and the evidence and arguments presented at the trial of this matter, the Court issues the following findings of fact and conclusions of law.

## I.   MOTION IN LIMINE

Prior to trial, Defendant Metropolitan Life Insurance Company ("MetLife") moved to exclude evidence Plaintiff Dr. Chloe Bird obtained by way of a subpoena served on non-party The RAND Corporation. (Mot. Limine, ECF No. 38.) At trial,

1  the Court tentatively granted MetLife's motion.  (*See* Mins. of One Day Ct. Trial.)

2  The Court adopts this ruling as its Order and hereby **GRANTS** MetLife's Motion in

3  Limine.

## II.   FINDINGS OF FACT

5  1.   Dr. Bird is the surviving spouse of her late husband Dr. Alan Fremont.

6  Dr. Fremont was a RAND employee from February 2000 up to the date of his death.

7  2.   RAND established and maintained the RAND Employee Benefits

8  Program (the "Plan") to provide basic and supplemental life insurance benefits to

9  eligible Plan participants, including Dr. Fremont.

10  3.   The Plan is an employee welfare benefit plan governed by ERISA,

11  29 U.S.C. §§ 1001–1461, and RAND is the Plan administrator.

12  4.   Dr. Bird is the named beneficiary of Dr. Fremont's RAND-sponsored life

13  insurance benefits.

14  5.   MetLife issued a group certificate of insurance dated August 1, 2010, to

15  RAND   entitled   "YOUR   EMPLOYEE   BENEFIT   PLAN   /   THE   RAND

16  CORPORATION / All Full-Time and Part-Time Employees / Basic Life Benefits /

17  Supplemental Life Benefits / Voluntary Accidental Death or Dismemberment

18  Benefits" ("Certificate").  The Certificate describes the basic and supplemental life

19  insurance benefits of the Plan and sets forth the conditions and terms of Dr. Fremont's

20  life insurance coverage.

21  6.   Under the Plan, MetLife calculates basic and supplemental life insurance

22  benefit amounts as a multiple of the employee's salary, as determined and reported by

23  RAND.

24  7.   The Plan provides:

25  Your earnings on the date you become covered under This Plan will
26  determine your benefits on that date. Any increase or decrease in your
    benefits will take place on the date of change in your earnings provided
27  you are Actively at Work on that date. If you are not Actively at Work on
28  the date of change in your earnings, the change in your benefits will take

2

place when you return to Active Work.

8.     The Plan defines "Actively at Work" or "Active Work" as follows:

"Actively at Work" or "Active Work" means that you are performing all of the material duties of your job with the Employer where these duties are normally carried out. If you were Actively at Work on your last scheduled working day, you will be deemed Actively at Work:

> 1. on a scheduled non-working day;
> 2. provided you are not disabled.

9.     At some point before October 2019, RAND decided to change the method it used to determine an employee's earnings for the purpose of calculating life insurance benefit amounts. Specifically, as of October 1, 2019, RAND would no longer use part-time employees' full-time equivalent salary to determine their benefits, but instead would determine their benefits based on their part-time scheduled hours.

10.     As part of this earnings calculation change, RAND employees, including Dr. Fremont, were given several options regarding the continuation of their life insurance benefits.  These options were provided on a personalized Enrollment Form that RAND, as the Plan administrator, prepared and distributed.

11.     Dr. Fremont's Enrollment Form presented him with four options for life insurance coverage under the new earnings calculation method:

Option 1: Be "grandfathered"—i.e., keep the current total coverage amount in place by paying for supplemental life insurance to cover the gap created by RAND's change in earnings calculation method.

Option 2: Add an additional 1x earnings of supplemental life coverage.

Option 3: "Accept adjusted coverage," which in Dr. Fremont's case would have meant continuing with 1.5x basic and 1x supplemental life insurance (at a lower total coverage amount due to the change in earnings calculation method).

Option 4: Decline or drop supplemental coverage.

1    None of these options required Dr. Fremont to submit a Statement of Health or other

2    health qualification.

3        12.    The Enrollment Form indicated that any changes would go into effect on

4    October 1, 2019.

5        13.    Dr. Fremont's earnings based on his full-time equivalent hours were

6    $189,000 and his earnings based on his part-time scheduled hours as of June 24, 2019

7    were $165,128.69.  Prior to the October 2019 election period, Dr. Fremont had basic

8    life insurance in the amount of 1.5x his earnings and supplemental life insurance in

9    the amount of 1x his earnings, for total coverage of $472,000.  RAND paid the

10    premiums for Dr. Fremont's basic life insurance, and Dr. Fremont paid the premiums

11    for his supplemental life insurance.

12        14.    Dr. Fremont selected Option 2.   Under this option, RAND would

13    continue to pay the premium for basic life insurance at 1.5x his newly-calculated

14    earnings ($165,000 x 1.5 ≈ $248,000 (rounding rules omitted)).  Dr. Fremont would

15    continue to pay the premium for supplemental life insurance at 1x his

16    newly-calculated salary, *and* he would pay an additional premium for new

17    supplemental life insurance at an additional 1x his newly-calculated salary.  The total

18    amount of the requested supplemental benefit was $165,000 x 2 = $330,000.

19        15.    Next to the space for selecting Option 2, the Enrollment Form indicates,

20    "I elect to increase my current supplemental life coverage by 1x my basic annual

21    earnings (calculated using scheduled hours). My RAND-provided and supplemental

22    coverage both _will_ adjust based on changes to my scheduled hours or rate of pay in the

23    future."

24        16.    The Enrollment Form contains the following additional provisions:

25    (1) "All charts are based on your pay rate and scheduled hours as of July 9, 2019.

26    Rates may differ if you had a pay change since July 9." (2) "In the event of any

27    discrepancy, the Plan Document governs all coverage."

28        17.    Regarding the option Dr. Fremont selected (Option 2), a Frequently

Asked Questions document RAND sent Dr. Fremont along with the Enrollment Form indicates:

> If you wish, you can elect an additional 1x basic annual earnings in coverage over what you currently have without providing a statement of health . . . if you do so by September 20.  Starting October 1, basic annual earnings for part-time staff will be determined by scheduled hours on record, and supplemental life coverage amounts will be calculated accordingly.

18.    Dr. Fremont submitted his enrollment form on September 8, 2019.

19.    Dr. Fremont's last scheduled working day was September 25, 2019, and he worked no other days beyond that date.

20.    Dr. Fremont did not work on or after October 1, 2019.  He remained an employee of RAND, collecting long-term disability benefits until the date of his death.  Between October 1, 2019 and the date of Dr. Fremont's death, he used three intermittent sick days (October 9, October 10, and November 20, 2019) and one floating holiday (December 20, 2019).

21.    Dr. Fremont died on February 26, 2020.

22.    MetLife determined that, because Dr. Fremont was not "Actively at Work" on or after October 1, 2019, he was not eligible for the increase in supplemental life insurance coverage that would have taken effect on October 1, 2019.

23.    At first, MetLife agreed to pay Dr. Bird a total life insurance benefit of $414,000.  This was calculated using Dr. Fremont's reported part-time rounded earnings of $166,000, with a 1.5x basic benefit and a 1x supplemental benefit.

24.    At RAND's request, MetLife increased Dr. Bird's total benefit to $473,000.  MetLife calculated this increased benefit based on Dr. Fremont's full-time equivalent earnings of $189,000, with a 1.5x basic benefit and a 1x supplemental benefit.

25.    MetLife actually paid Dr. Bird a total of $473,000 in basic and supplemental life insurance benefits.

26.     MetLife did not pay Dr. Bird the additional 1x supplemental benefit Dr. Fremont requested when he selected Option 2 on the Enrollment Form.

27.     Dr. Bird appealed MetLife's decision, requesting that MetLife pay the supplemental benefit Dr. Fremont selected when he selected Option 2 on the Enrollment Form.

28.     MetLife denied Dr. Bird's appeal.

29.     Dr. Bird has exhausted her administrative remedies.

30.     Dr. Bird filed this ERISA action to recover the unpaid additional supplemental benefit, asserting causes of action against MetLife for breach of insurance contract, 29 U.S.C. § 1132(a)(1)(B) and for breach of fiduciary duty, 29 U.S.C. § 1132(a)(3).

### III.     CONCLUSIONS OF LAW

1.      Under ERISA, a participant in an ERISA-governed welfare benefit plan may bring a civil action "to recover benefits due to him under the terms of [the] plan, to enforce [his or her] rights under the terms of the plan, or to clarify [his or her] rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

2.      "[I]nterpretation of ERISA insurance policies is governed by a uniform federal common law." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir. 1990).  In interpreting ERISA policies in this manner, courts should "refer[] to" and be "guided by principles of state contract law." *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1500 (9th Cir. 1984).

3.      "A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The parties agree that this case is to be decided on a de novo basis.

4.      Under a de novo standard of review, courts interpret the terms of an ERISA-governed benefit plan "in an ordinary and popular sense as would a person of

average intelligence and experience." *Evans*, 916 F.2d at 1441 (internal brackets and quotation marks omitted).  Under this approach, "courts will protect the reasonable expectations of applicants, insureds, and intended beneficiaries regarding the coverage afforded by insurance carriers even though a careful examination of the policy provisions indicates that such expectations are contrary to the expressed intention of the insurer." *Saltarelli v. Bob Baker Grp. Med. Trust*, 35 F.3d 382, 386 (9th Cir. 1994).  Courts should resolve any material ambiguities in the Plan in favor of the insured. *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993).

5.      Based on the foregoing findings of fact, Dr. Fremont was not "Actively at Work" or "Actively Working" on or after October 1, 2019.

6.      As of October 1, 2019, Dr. Fremont was "disabled" as that term is used in the Plan's definition of "Actively at Work" or "Actively Working."

7.      Based on the conclusion of law set forth in paragraph 6, Dr. Fremont was not "Actively at Work" or "Actively Working" on or after October 1, 2019.

8.      A reasonable insured[1] would expect that any changes made as part of the October 2019 special enrollment period would go into effect on October 1, 2019, and that MetLife would calculate benefit amounts based on employee earnings as of that date.

9.      A reasonable insured would not expect that an employee with zero scheduled work hours on or after a given date is "Actively at Work" or "Actively Working" as of that date.

10.     A reasonable insured would expect that an employee on long-term disability was "disabled" as that term is used in the Plan's definition of "Actively at Work" or "Actively Working," and that the employee therefore was not "Actively at Work" or "Actively Working" while on long-term disability.

11.     A reasonable insured would not expect that an employee who was not

---

[1] All findings related to the insured's reasonable expectations are limited to the factual presentation in this case.

"Actively at Work" or "Actively Working" (as those terms are defined in the Plan) on or after October 1, 2019, would be eligible for newly added, recently selected benefits that were to become effective on October 1, 2019.

12.    Under the terms of the Plan, Dr. Fremont was not eligible for the additional supplemental benefit he requested because he was not "Actively at Work" or "Actively Working" on or after October 1, 2019, the date the change he requested would have gone into effect.

13.    Because Dr. Fremont was not "Actively at Work" or "Actively Working" on or after October 1, 2019, it is just, logical, and equitable for Dr. Bird to receive a benefit amount equaling what she would have received had RAND never decided to change its earnings calculation method (a change that took place on October 1, 2019).

14.    At bottom, MetLife ultimately paid Dr. Bird a total life insurance benefit equaling what it would have had to pay Dr. Bird had RAND never decided to change its earnings calculation method.  Accordingly, MetLife correctly paid the benefits due and correctly denied benefits not due.

15.    MetLife's claim determination was in accordance with the express terms of the Plan and was supported by substantial, credible evidence in the Administrative Record.

16.    MetLife owes Dr. Bird no further benefits, and accordingly, her claim in the First Amended Complaint to recover additional Plan benefits fails.  (First Am. Compl. ("FAC") ¶¶ 1–23.)

17.    MetLife did not breach its fiduciary duty to Dr. Bird, and accordingly, her claim in the First Amended Complaint for breach of fiduciary duty fails.  (FAC ¶¶ 24–28.)

18.    Whether or not the Court considers the Enrollment Form as part of the operative Plan documents, these conclusions of law remain the same.

19.    Whether or not Dr. Fremont received a separate certificate of insurance for the additional supplemental benefits at issue, these conclusions of law remain the

same.   Dr. Fremont wished to avail himself of an opportunity to increase his 1x supplemental benefit under the old earnings calculation method to a 2x supplemental benefit under the new earnings calculation method.  Dr. Fremont was not required to submit a statement of health, and the additional supplemental benefit would have been subject to the same terms and conditions governing the supplemental benefit already in effect prior to the events of this case.  A reasonable insured who received no separate certificate would expect that the certificate and other documents that governed the insured's supplemental benefits up to the change would be the documents that would also govern the new increased supplemental benefits.

20.    To the extent the requirement that Dr. Fremont be "Active at Work" or "Actively Working" on or after October 1, 2019 is a condition subsequent of supplemental coverage, MetLife has met its burden of establishing this condition subsequent.  *Searle v. Allstate Life Ins. Co.*, 38 Cal. 3d 425, 437–38 (1985).

**21.    The Court finds in favor of MetLife.  MetLife shall be dismissed, and Dr. Bird shall recover nothing from MetLife.**

### IV.    CONCLUSION

For the reasons discussed above, the Court **ORDERS** that MetLife be **DISMISSED** from this lawsuit.  The Court will issue a judgment.

**IT IS SO ORDERED.**

September 29, 2021

_____
OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE